Edwin D. Vennard
vs.                    No. 1169.
Harold Lihme

November 30, 1925

CAPOTOSTO, J. The plaintiff in an action of trespass on the case for negligence received a verdict from the jury with damages assessed at $18,-000. The defendant moves for a new trial and urges not only that the verdict is against the evidence and the weight thereof, but also claims that the verdict is the result of sympathy and prejudice.

The case revolves about the collision between a Packard motor car driven by the defendant and a motorcycle operated by the plaintiff at the intersection of Elm and School streets in the town of Westerly in the early afternoon of September 23, 1924. The day was clear and the roadways were dry. The defendant, a young man 18 years of age, is a resident of Watch Hill. The plaintiff, at the time of the accident, was a little over 20 years old and employed as a coast guard in the Uited States coast service at Watch Hill.

At the point of the accident Elm street runs practically north and south. School street intersects Elm street and runs for all intents and purposes east and west. The southeast corner of Elm and School streets is a square corner while the other three corners are rounded out to a greater or less extent. The Pendleton property, so called, is situated at the southeast corner of Elm and School streets and is enclosed by a low wall of masonry and some shrubbery, which shrubbery grows thicker as you proceed in an easterly direction along School street. This corner is clearly reproduced in the photographs introduced in evidence by the defendant and marked defendant's exhibits, A2, A5, A8. At the southwest corner of Elm and School streets is located the Langworthy residence, which property is enclosed by a picket fence of the ordinary size and has no shrubbery at or in the immediate vicinity of its rounded corner. Elm street is lined with trees of considerable size on both sides of the street. (Defendant's Exhibits A4 and A9.) Elm and School streets are approximately the same in width, some 26 and 25 feet wide respectively. Proceeding in a northerly direction Elm street presents a down grade as you approach the intersection of School street. Travelling in an easterly direction School street has an up grade which extends beyond the line of intersection of the two streets in question. (Defendant's Exhibits A2, A3, A4, A5, A8.

On the day in question the plaintiff, having received leave of absence, was riding his motorcycle in a northerly direction along Elm street, intending to go through Westerly to his parents' home in Stonington, Connecticut. The defendant was out in his motor car with a school chum, John L. Pardridge, and two young girls, Miss Carrie Nye, 17 years old, and Miss Edith Burke, 19 years of age, driving in an easterly direction up School street. The automobile and motorcycle came together at some more or less indefinite point beyond the easterly curb line of Elm street at or in the vicinity of the center of School street.

Before proceeding with a consideration of the evidence as to liability, the Court desires to state that there was nothing improper in the fact that the defendant and his chum were taking the two young ladies out for a short time. The boys called for the two girls at the home of Miss Nye and started off on an aimless

automobile ride. Any innuendo that the whole affair was anything more than perhaps an innocent flirtation is unwarranted, either from the spoken evidence or from the appearance and demeanor of the parties concerned while on the witness stand. While this situation is deserving of careful consideration as to the attention or lack of attention which any one or all of these young people were paying to the existing conditions at the time of the accident, it is immaterial for any other purpose.

The first witness for the plaintiff, one William Liddell, testified that while he was on the westerly side of Elm street, north of the intersection of School and Elm streets, at a point about opposite the Fowler house, so called, he saw the automobile "just as it shot across;" that he could not tell how fast the car was going, that he first saw the motorcycle some 300 feet north of the intersection of Elm and School streets coming right along at a medium rate of speed; that he did not see the motorcycle change its speed in any degree, and that at the time of the collision he could not see the motorcycle as his view was obstructed by the intervening automobile.

Mrs. Lydia York Brown testified that while she was walking on the northerly side of School street, going toward Elm street, she saw the automobile coming up the crest of the hill at a great rate of speed and giving no signal; that as the automobile reached the westerly corner of Elm street she noticed the motorcycle in the vicinity of the Pendleton house, and that at that time it seemed to her as if the motorcycle made a quick turn in her direction. In cross-examination she stated that when she observed what she had testified to she was 75 feet away from the corner; that she had stepped off the distance from where she was to the corner but a few days before she testified and had counted 80 steps, but that, in any event, when she saw the accident she was opposite the gate to the schoolhouse yard. It may be important to observe at this point that the gate referred to, accordng to measurements made and subsequently testified to by Fred T. Mitchell, is 233 feet from Elm street. This witness further said that she had heard the noise of a motorcycle coming down Elm street but that she did not actually see the motorcycle until it had reached the corner and made a quick turn to its right; that she had no knowledge of the rate of speed of the motorcycle when she first saw it, and that in regard to the speed of the automobile, as to which she had testified to in direct, all she meant to say was that the automobile was going over 15 miles an hour.

Thomas Wilson Dorr Coy, a witness for the plaintiff, stated that at the time of the accident he was in his room, which is on the second floor of the dwelling house on School street, next below the Langworthy house; that is room as two windows, one facing School street, the other looking towards Elm street, the windows being some three feet or so apart; that he heard a noise on School street, went to the School St. window, and seeing nothing walked over to the window facing Elm street, from which position he saw an automobile strike a bicycle. He further said that the automobile was going at a speed of about 30 miles an hour. In his cross-examination, this witness testified that he first saw the motorcycle when it was struck by the automobile, that he did not know how fast the motorcycle was moving or whether it gave any signal. He further said that he got his view of the collision by looking toward Elm street between the limbs of two trees. In weighing the testimony of this wit-

ness, his advanced age and feeble condition of health must be kept in mind.

Edwin D. Vennard, the plaintiff, testified that he had been driving the motorcycle in question, of which he was part owner, for some distance back from the scene of the collision at a varying speed of between 20 to 30 miles an hour; that he had passed Crescent Street, which is south of School Street, at about 20 miles an hour; that knowing that Elm and School Streets was a dangerous intersection, he checked his speed so that when he reached the property line of the Pendleton property on Elm Street, he was going between 10 to 15 miles an hour; that as the down grade towards School Street begins at or about this point he slowed down still more, so that just before he reached the corner he was going at about 5 miles an hour, not over 7 miles in any event, and that when he actually got to the corner he was barely moving. Vennard further testified that when he was about opposite the steps leading to the Pendleton home, which are some 80 feet or so south of School Street, he looked to his left, across the Langworthy property, and saw nothing coming up School Street; that he then kept his head to the right until he reached the northerly line of the Pendleton property on School Street, when he glanced to his left, saw the defendant's automobile almost on top of him, and immediately turned to his right in an effort to avoid a collision.

The defendant's version of the occurrence in substance is that when the automobile, proceeding at a moderate rate of speed, had actually entered Elm Street, and was crossing the intersection of Elm and School Streets, the motorcycle, which was then in the vicinity of the steps of the Pendleton house, kept coming toward the automobile at a fast rate of speed. The speed of the motorcycle

was described in different ways by different witnesses. Miss Burke said that it was traveling very fast, about two times as fast as the car. According to Miss Nye, who caught just a glance of the motorcycle before her attention was diverted to the north, it was not going very fast, and it did not look to her as if it was going to smash into the defendant's machine. In the words of Pardridge, the motorcycle was coming rather fast, a fact which he remembered, partly on account of the noise which it made and partly by the manner in which it passed the scenery. The defendant himself said that when the front wheels of his automobile were on Elm Street, he noticed the motorcycle some 55 feet or more away, coming fast. According to the testimony of the defence, the motorcycle covered twice as much ground as the automobile from the time it was first observed until the motorcycle slowed its speed and swung into School Street.

The testimony of one Robert J. Robar, an automobile mechanic, who passed the defendant's car as it was coming up School Street toward Elm Street, to the effect that his attention was attracted to the defendant's Packard because it was coming up School Street at about 15 miles an hour in second gear and making plenty of noise, may be material in considering the testimony of the plaintiff's witness, Mr. Coy.

The physical evidence in this case is found in the two parallel motorcycle marks on School Street in the immediate vicinity of Elm Street, and in the damage to the automobile and motorcycle resulting from the impact. The two parallel marks made by the motorcycle, and which were observed immediately after the collision, started at a point 3.8 feet from the extended easterly curb line of Elm Street and 5.9 and 6.4 feet respectively from the southerly curb of School

Street. These marks extended in a slightly northeasterly direction on School Street for over 12 feet.

The entire damage to the automobile was on its right side. A dented front hub-cap, a bent front mudguard just behind the front wheel, a twisted running-board close to the rear door, a damaged front door, and an indentation three inches deep in the panel immediately to the rear of the front door constituted all the visible results of the collision. (Defendant's Exhibit A 10). With reference to the three inch indentation in the side of the automobile, George W. Hall of the Packard Motor Car Co., after describing the construction of a Packard body, testified that such injury could only be caused by applying a direct pressure of approximately 24,000 pounds at the point of damage. By mathematical computation this witness came to the conclusion that given a motorcycle similar to the one driven by the plaintiff and operated by a person of the plaintiff's weight, that motorcycle would have to travel at the rate of approximately 28 miles an hour to exert the necessary pressure. The motorcycle was badly bent and broken. The outstanding features of the damaged motorcycle were a frame twisted out of alignment some six inches to the left, and the bending back of both main and spring forks for about a similar distance. (Defendant's Exhibit A 12).

It is, perhaps, well to note at this point that every bit of specific testimony with reference to the condition after the accident of both the automobile and the motorcycle was developed by the defendant. The desultory attempt of the plaintiff to explain his inability to locate the co-owner of the motorcycle, thereby endeavoring to raise the inference of lack of knowledge of the damage to the motorcycle, is rather strained, to say the least, when disinterested witnesses were close at hand to furnish the desired information. Silent testimony is at times more convincing than spoken words.

In this case the testimony of the plaintiff on the question of liability can not be considered in its proper light without stopping to reflect upon the general impression of the plaintiff created by Vennard himself and by some witnesses called in his behalf. In the first place two of his witnesses, Dr. Edwin R. Lewis and Captain Broadmeadow, cast considerable doubt upon his dependency as to veracity. The former said that recently he occasionally found the plaintiff varying from the truth, and never knew whether to believe him or not until he had checked him up; the latter, that for the last year he doubted the plaintiff's truthfulness as he seemed to imagine a whole lot. Secondly, the plaintiff, who claims to have suffered a loss of "mental acuity" as a result of the accident, stated that he had no difficulty in remembering what he wanted to remember, a fact which he demonstrated quite well by his testimony while on the witness stand. Exaggeration frequently belies sincerity. Claiming, as he does, an entire loss of hearing in his right ear, the plaintiff evinced no trouble in answering the questions asked in a normal tone by his own attorney but was confronted with great difficulty, necessitating frequent repetition, when questioned in as loud, or even a louder tone by counsel for the defendant.

The third and most interesting manifestation inviting caution was given by the plaintiff when he was questioned about the sight of his right eye, in which, according to him, he had no sight except possibly to distinguish light from dark. The testimony discloses no organic pathological or objective weakness of the eye in question. The Snellen's Test Card, with which the plaintiff was familiar (De-

fendant's Exhibit C) was placed at a distance of some 15 feet from the witness stand and the plaintiff was asked to read what he could with the right eye. Vennard's answer in substance was, that while he could distinguish a card with something on it, he could not tell what that something was. In an examination made only a few hours after the giving of this testimony, the plaintiff could read the first and second lines and two letters of the third line of Snellen's Test Types at 15 feet without glasses, and the entire fourth line and possibly a letter of the fifth with glasses. The difference in these subjective results obtained within the space of a few hours from one another can be better explained by a lack of veracity in the individual rather than by science. The attempted explanation by the plaintiff of this apparent miraculous restoration of vision, to the effect that when he was examined by the physicians he was calling out the letters on the various lines of the Snellen card from memory and not because he actually saw them through his right eye sounds like evasion pure and simple. If he actually could not see and said that he could see then he falsified the facts to the examining physicians; if he could see and positively testified that he could not see, then he misrepresented the facts while a witness under oath. If his testimony as to his principal injuries is found to be unreliable and fairly construable as bordering upon or actually within the realm of fiction, what weight shall be given to the rest of his evidence, which seeks to explain his conduct at the time of the accident?

All things considered, did the plaintiff show by a fair preponderance of credible and reliable testimony that he was in the exercise of due care?

In the last analysis, the plaintiff's conduct at the time of the accident must be determined from his own testimony. His witness, Liddell, saw the motorcycle coming right along towards the intersection of the streets in question at a medium rate of speed and without changing its speed in any degree up to the time the automobile of the defendant cut off his view. Mrs. Brown, who was in reality 238 feet from the corner, first heard the noise of the motorcycle and then actually saw it make a quick turn to its right into School Street. Mr. Coy testified that he did not know how fast the motorcycle was moving at the time of the collision. Eliminating these witnesses, we have left only the plaintiff's evidence as to his own conduct shortly before the accident. Without going into further detail, his operation of the motorcycle, as testified to by him, at or in the vicinity of Elm and School Streets, is so different from what is ordinarily seen in daily experience as to make one approach his testimony with caution. When we recall that he is considered by his own witnesses as a person who imagines a whole lot, and that his statements can not be accepted as true until he is checked up, then his version of the occurrence raises suspicion. Upon weighing his evidence as to liability in the light of his grossly exaggerated claim of injuries, especially his unexplained loss and restoration of sight within a few hours, his testimony becomes permeated with serious doubt as to its truth and sincerity. The plaintiff's version of his own actions is uncorroborated by his witnesses and specifically contradicted by the testimony of the defense.

The physical evidence is also against his contention. The three-inch indentation of the automobile in the panel just back of the front door bespeaks, according to undenied testimony, the application of a considerable and direct force applied at that

particular point. A motorcycle which had reached that corner at a speed so that it was barely moving could not exert a force sufficient to have caused such damage. The damage to the motorcycle showing among other things a bending back of some six inches of the main and spring forks, is not to be overlooked in determining how the motorcycle and automobile came into contact with each other. The two marks of the motorcycle upon the roadway of School Street, furthermore, are more consistent with the sudden checking up of a rapidly moving object than with the attempted explanation of a dragging of such object by another. The regularity of the marks and the uniformity of their progress into School Street evidences a sudden attempt to check and control the speed and direction of the motorcycle. The claim that the plaintiff was confronted with an emergency and that he acted under circumstances demanding immediate action is not sustainable because the emergency, so called, was a condition created in part at least by the plaintiff's own conduct.

While the question of the defendant's negligence is one fairly open to different conclusions, the proposition as to the plaintiff's due care is not supported by credible testimony. In fact, the weight of the evidence is against the plaintiff's contention.

Having arrived at this result, any consideration of the amount of damages is unnecessary, except to say that the award of $18,000 is extremely excessive, unjust, and unsupported by the evidence.

Motion for new trial granted.

For Plaintiff: John B. Ferguson.

For Defendant: Herbert W. Rathbun.